IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 20, 2004

## STATE OF TENNESSEE v. JOHN RAY THOMPSON

**Direct Appeal from the Circuit Court for Bedford County**
**Nos. 15131, 15236 & 15116   Charles Lee, Judge**

---

**No. M2003-00487-CCA-R3-CD**
**No.  M2003-01824-CCA-R3-CD - Filed December 20, 2004**

---

The Defendant, John Ray Thompson, appeals his convictions from two separate jury trials, where he was convicted of seventeen crimes involving his sexual contact with three minor girls.  The trial court sentenced the Defendant to an effective sentence of eighty years for his convictions in both trials, of which sixty-nine years must be served at 100%.  On appeal, he contends that: (1) the evidence is insufficient to sustain three of his convictions; (2) the State failed to elect facts to support two of his convictions; and (3) the trial court erred when it sentenced him.  After throughly reviewing the record and the applicable authorities, we affirm all of the Defendant's convictions in both trials except for two of his convictions for sexual battery because the jury was improperly instructed on those counts, and the instructional error was not harmless beyond a reasonable doubt. Further, we hold that the trial court improperly enhanced the Defendant's sentences in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), and we reduce the Defendant's sentence in accordance with this opinion to an effective sentence of sixty-eight years, sixty of which must be served at 100%.  We remand the case for the entry of appropriate judgments of conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, and NORMA MCGEE OGLE, JJ., joined.

Merrilyn Feirman (on appeal), Nashville, Tennessee, and Jack Dearing, III (at trial), Shelbyville, Tennessee, for the appellant.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; W. Michael McCown, District Attorney General; Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

This appeal arises from two separate cases in which the Defendant was convicted of crimes involving sexual activity with three minor girls. Upon motion of the Defendant's counsel, we consolidated the Defendant's two separate appeals into this one appeal because of the shared evidence from the two trials.

### A. Case Number 15116, Appeal Number M2003-00487-CCA-R3-CD

On August 19, 2002, the Bedford County Grand Jury indicted the Defendant in case number 15116 for: aggravated sexual exploitation of a minor; incest; attempted rape of a child; seven counts of rape of a child; aggravated sexual battery; sexual exploitation of a minor; aggravated sexual exploitation of a minor; and especially aggravated sexual exploitation of a minor. The Defendant was tried for these crimes on November 12, 2002, and the following evidence was presented at his trial.

B.C.[1] testified that she was born on September 27, 1988, and, at the time of trial, she was in eighth grade and was living with her grandparents. She said that her mother was married to the Defendant and had been for several years. She said that, in the past, she would go and visit her mother and would sometimes spend the night. She explained that her grandparents would take her to her mother's house and then they would pick her up the next day. B.C. testified that, between August and September of 2001, she would visit her mother approximately every other week. B.C. said that, at the time of her visits, the Defendant was living with her mother and her mother was working at the Best Western Motel.

B.C. testified that, between August and September of 2001, the Defendant asked her to pose for some pictures when her mother was not there. She explained that one night, when she spent the night at her mother's house, she slept in the living room on the couch. She said that, around 10:00 p.m., the Defendant woke her up and asked if he could take some pictures. She said that she asked the Defendant where her mother was, and the Defendant told her that her mother had gone to work, which surprised her. She then asked the Defendant where her brother was, and the Defendant told her that he was at a friend's house. B.C. testified that she told the Defendant that he could take some pictures, and he got his camera, which was grayish-silver with a screen on the back. B.C. said that the first few pictures were just normal pictures, and the Defendant asked her to lay on, or stand next to, the couch. B.C. said that she was wearing sweat pants and a shirt.

B.C. said that the Defendant then went to her mother's room, retrieved what he called a "lingerie outfit," and asked her to put it on so that he could take some more pictures. She said that she went to the bathroom and changed into the outfit, and, when she came out of the bathroom, the

---

[1]In order to protect the victim, who is a minor, we refer to her using her initials.

Defendant took more pictures of her. She said that he then he asked her to pull down part of the outfit so as to expose her breast.

B.C. testified that, on another occasion, the Defendant woke her up around 1:00 a.m. and asked her to pose in lingerie again. She said that he had the same camera and again asked her to remove part of the lingerie to expose her breasts. She explained that he continued to take pictures while her breasts were exposed. B.C. testified that, after taking more photographs, the Defendant asked her to engage in oral sex with him. She said that he unzipped his pants and exposed his penis and that he put his penis in her mouth. B.C. testified that, during this event, the Defendant rubbed the outside of her vagina with his hand and then "put his mouth down there." She said that, when the Defendant touched her, she was wearing sweat pants and underwear, and he touched her underneath both of these articles of clothing, so that his bare skin was on her bare skin. When the Defendant touched his mouth to her "private part," he "moved it around for a little while. Then he looked up at the clock and said [B.C.'s] mom w[ould] be home soon." She testified that the Defendant then told her to watch television, and he went into the computer room. B.C. said that all of this happened before her thirteenth birthday. B.C. testified that she was scared when she and the Defendant were engaged in this activity and the Defendant told her "Don't worry. It is okay. . . . Most fathers do this to their daughters." B.C. said that she did not tell her mother because she was "scared" of the Defendant.

On cross-examination, B.C. said that her grandmother has never liked the Defendant. She said that she and her grandmother previously had conversations about how "sorry" the Defendant was. She testified that she did not make a statement to police about these events until June 14, 2002, which was nine or ten months after they occurred. She said that she never refused to go over to her mother's house. B.C. testified that, even though she lived at her grandmother's house, which was over an hour from her mother's house, she was still afraid to tell her grandmother what had happened. She also said that she originally denied the events when Lieutenant Hord first asked her about them. B.C. conceded that she never saw any of the pictures that the Defendant took of her, and she was unsure whether there was any film or a disk in the camera. B.C. said that she never had intercourse with the Defendant and that his fingers never went inside her. B.C. also said that, at the time of these incidents, and for a long time before them, she did not like the Defendant because he forced her mother to move away from her. She denied that she was angry that her brother lived with her mother and that she lived with her grandmother.

On re-direct, B.C. said that she did not visit her mother at all in 2002. She also said that when Lieutenant Hord first asked her about the Defendant's conduct, her grandmother was in the room and could hear everything. It was not until her grandmother stepped out that she told the officer about what the Defendant had done.

Upon the Court's questioning, B.C. said that she never saw the pictures that were taken of her, but she knew that the Defendant took pictures of her with a camera.

K.J.[2] testified that she was born on November 27, 1989, and in June of 2002 she was twelve years old. She said that the Defendant had been friends with her family since she was born and that, because of this friendship, she would sometimes spend time at the Defendant's house. K.J. testified that between June 1 and June 8 of 2002 she spent several days in a row at the Defendant's house because her grandfather had died. K.J. said that sometimes the Defendant's wife was there, but that sometimes she would leave to go to work at the Best Western Motel in Murfreesboro.

K.J. testified that, while she was staying at the Defendant's house, he asked her to come out to the shed, which she did. She said that she went into the shed, and the Defendant told her to take her clothes off, which she did. He then told her to play with herself while she was sitting on a bucket that he put her on, and she complied. K.J. said that the Defendant then started playing with her by putting her fingers inside of her vagina and "moving them around." She said that the Defendant then put his tongue inside of her vagina and "moved it around." She also said that the Defendant licked her breasts.

K.J. testified about the "next time" and said that the Defendant did the same thing to her again in the shed after he asked her to go there with him. She said that he again inserted his fingers and tongue in her vagina and that he "licked around on [her breasts] and sucked them." K.J. said that the Defendant told her not to tell anyone or he would get into trouble. K.J. testified that the Defendant told her that he was going to make her a model, and he took pictures of her. She said that the Defendant told her to take her clothes off. K.J. said that, the day after the Defendant sexually interacted with her twice, he took pictures of her. K.J. testified about a third incident in the shed, that happened after the Defendant took pictures of her when he "put his fingers inside her [vagina] and moved them around" and did the same with his tongue. She said that this again occurred in the shed. K.J. said that the Defendant then brought her outside beside the shed and put her on a chair. He then proceeded to digitally and orally penetrate her and then engaged in intercourse with her. K.J. told the Defendant that this hurt her, but he did not stop. K.J. testified about a fourth incident in the shed where the Defendant digitally and orally penetrated her and "sucked on [her] breasts."

K.J. also testified about a fifth sexual encounter with the Defendant that occurred inside of the Defendant's house. She said that the Defendant told his son to go outside and then told K.J. to go to his bedroom. K.J. testified that the Defendant's wife was at work during this encounter. She said that the Defendant took her clothes off of her while she was laying on the bed on her back. The Defendant then took his clothes off and proceeded to digitally penetrate K.J. while asking her if she liked it. K.J. said that the defendant then orally penetrated her, and then he engaged in intercourse with her. She said that she told the Defendant again that this hurt, but he did not stop. K.J. testified that the phone rang, and the Defendant answered the phone. She said he then came back to the bedroom and began masturbating; then he ejaculated on her stomach. K.J. testified that the Defendant told her to go the living room, which she did. K.J. said that she was still naked in the living room and that the Defendant placed her on the couch and then put in a pornographic movie

---

[2]In order to protect the victim, who is a minor, we refer to her using her initials.

on the television.  The Defendant then digitally and orally penetrated her and then again engaged in intercourse with her.  She said that this encounter ended when the phone rang again, and the Defendant said it was time for his wife to come home from work.

K.J. testified about another incident that occurred at the motel where the Defendant's wife worked, which was located in Murfreesboro, Tennessee.  She said that she was at the motel with the Defendant's wife because she wanted to "get away from [the Defendant]."  K.J. said that she went swimming in the motel pool and that, after she got out of the pool and was drying off, the Defendant "showed up."  She said that the Defendant had a key to the motel rooms, and she went with him to check the rooms to see which ones were clean.  K.J. said that she and the Defendant then entered room number 117, which was located the farthest away from the office by the dumpster, and that the Defendant began to photograph her.  She said that, at this time, she had on a two piece bikini and a t-shirt.  She testified that the Defendant told her to smile, and she did not want to but he told her to "do it for the camera."  K.J. testified that, at some point, the Defendant told her to take her clothes off.  While the Defendant was taking pictures, he digitally and orally penetrated her, and then he engaged in intercourse with her.  K.J. said that the Defendant took a picture of his penis entering K.J.'s vagina while he was standing behind her.  Many of the pictures about which K.J. testified were admitted into evidence during the trial.

K. J. testified that, shortly after this last incident, her visit with the Defendant and his wife was over, and she went home.  K.J. said that, when she went home, she told her mother what had happened.  K.J. testified that she then spoke with police about her interactions with the Defendant.

On cross-examination, K.J. testified that she had been going to the Defendant's house for approximately five years and that, prior to these events, nothing had happened between the them.  K.J. said that the shed, where many of these events occurred, was located on the side of the house and was visible from the road.  She said that there are neighbors that live back behind the shed.  She testified that the shed has one door on it that locks.  K.J. testified that she did not know where the Defendant's stepson was during these events, and, during one of the events, the Defendant's wife and his son were both in the house.  K.J. testified that she told the Defendant's stepson what the Defendant had done and that the stepson said that he knew it had been happening all along.  She said that, after the morning when the Defendant first had a sexual encounter with her, she again went to the shed with him that evening, but did not think that he would do the same things to her.  K.J. testified that every time she attempted to call home the Defendant was around her, so she waited until she got home to tell her mother.  K.J. conceded that the Defendant never threatened her.

Rebecca Hord, a lieutenant with the Bedford County Sheriff's Department, testified that her chief notified her that there was a possible child rape case, and he asked her to interview the witnesses and to assist in investigating the case.  She said that, as part of her investigation, she interviewed K.J.  After interviewing K.J., she determined that the Defendant had a stepdaughter, B.C, and she interviewed B.C. as part of her routine investigation.  Lieutenant Hord said that her interview with B.C. lasted from 11:07 a.m. until 11:59 a.m.

The lieutenant said that, as part of her investigation, she went to the Defendant's home with the cooperation of the Defendant's wife. Lieutenant Hord said that, at some point, she obtained the Defendant's wallet, which contained a master key to the Best Western Motel. The lieutenant testified that she also seized a computer from the Defendant's home to find out if there was anything relevant to any crime stored on the computer. She said that she made arrangements with the Tennessee Bureau of Investigation ("TBI") office in Nashville, specifically with Agent Tom Davis who is the computer specialist. The officer testified that Agent Davis looked at the computer and retrieved photographs from the computer. She said she looked at the photographs and recognized some of them as of K.J. On cross-examination, the officer said that the Defendant gave the police permission to take the computer by signing a consent to search form. She also said that the Defendant did not work at the Best Western Motel.

David Williams, Jr., a sergeant with the Bedford County Sheriff's Department, testified that he met the Defendant at the sheriff's department on June 8, 2002. He said that he obtained permission to search the Defendant's residence from both the Defendant and the Defendant's wife. The officer testified that he and three other officers went to the Defendant's home to conduct a search. He said that when they got to the address they saw a mobile home and a "mini barn" behind the residence. Sergeant Williams testified that he primarily searched the mini barn, and the Defendant was present during this search. He said that, in the mini barn, he discovered a group of photographs in an envelope on a shelf that was concealed by a row of clothes. The officer said that, in addition to the photographs, the police seized a digital camera and a computer from the Defendant's home. Sergeant Williams testified that the Defendant appeared nervous as he observed the officer searching the mini barn. On cross-examination, the officer confirmed that the Defendant provided him permission to search the home and mini barn.

Tom Davis, a computer evidence specialist with the TBI, testified that he received a computer from the Bedford County Sheriff's Department on July 12, 2002. He said that he examined the Defendant's computer and found approximately 700 pictures. He said that, of the 700 photographs, he placed approximately 144 photographs of women, some of which were sexually explicit photographs, on a CD ROM that he then gave to police. Agent Davis presented some of the pictures that he found on the Defendant's computer to the jury.[3] Agent Davis then presented some photographs of the Defendant to the jury. He also presented some pictures of K.J. that he found on the Defendant's computer.[4] The agent confirmed that he found all of these pictures on the hard drive of the Defendant's computer.

On cross-examination, the agent admitted that he did not know from personal knowledge that this computer belonged to the Defendant. He also stated that he did not know who placed the pictures on the computer. The agent testified that the Defendant's digital camera used a "flash card,"

---

[3]The Agent presented the following photographs to the jury: C148; C149; C151; C152; C153; C156; C157; C158; C210; C211; C212; C215; C216; C218; C219; C220; and C221.

[4]The Agent presented photograph numbers: DC60; DC61; DC62; DC63; DC64; DC65; DC66; DC67; DC68; DC69; DC70; DC71; DC72; DC73; DC74; DC75; DC76; DC77; DC78; and DC79.

the pictures on the flash card could be easily downloaded to a computer. Agent Davis explained that, in addition to the photographs of unclothed women, there were normal pictures on the Defendant's computer.

C.G.[5] testified that she was born February 4, 1987, and that she was the person pictured in eighteen of the photographs.[6]

The Defendant called C.C.,[7] B.C.'s brother and the Defendant's stepson, who testified that he was eleven years old at the time of trial. He said that, during June 1 through June 8, 2002, he was living with his mother and the Defendant, who is his stepfather. C.C. said that, during this time frame, K.J. came to stay at his house. He said that K.J. never told him that his stepfather was acting inappropriately with her, and he did not see the two acting inappropriately with each other. C.C. testified that K.J. would go in the shed with her boyfriend, who also stayed at the house during that time. C.C. testified that one time he went for a walk while K.J. was at his house, and K.J. was sleeping in C.C.'s bedroom and the Defendant was sleeping in the Defendant's room. When he returned, they both were both still asleep in their respective rooms. C.C. said that he and the Defendant both had access to the computer, and he said that K.J. could have had access to it also. On cross-examination C.C. testified that the Defendant used the computer the most, and the Defendant would use the computer to get on the Internet. C.C. denied that he told police that K.J. told him that the Defendant inappropriately touched her.

The Defendant testified on his own behalf that, around June 8, 2002, he was the maintenance man for the Best Western Motel. The Defendant said that B.C. is his stepdaughter and that she has never lived with him and his wife, but lived with her grandmother. He said that B.C. stopped visiting around Christmas of that year. The Defendant testified that he owned a Polaroid digital camera, the same one that was admitted into evidence at the trial. He testified that he left the camera in different places and that it was used by everyone in the house. Additionally, he said that everyone had access to the computer and that the computer was not protected with a password. The Defendant testified that, in June of 2002, a close relative of his wife's passed away, and K.J. visited them during that week. He said that K.J. came over frequently, as did K.J.'s boyfriend. The Defendant said that he and K.J. got into an argument, and he took her home. He said that she was upset with him for taking her home. The Defendant said that he was never in the shed alone with K.J. and that he never sent his son for a walk by himself on the road.

The Defendant said that, when he found out that he was being accused of inappropriate sexual activity with a minor, he called the sheriff's department and asked them to come out to the house so that he could talk to someone. He said that after approximately five hours no one came,

---

[5]Because of the nature of C.G.'s testimony, we choose to refer to her by her initials.

[6]We note that the State originally showed the jury seventeen pictures of C.G., but during the direct examination of C.G. the State asked her about an additional photograph, number C222.

[7]Due to this witness' relation to the victim, we choose to refer to him by his initials.

so he called again, and the police told him to come down to the police station, which he did. He said that he gave police permission to search his house. The Defendant said that the police told him that "the young lady says there are pictures in the shed," and the Defendant responded, "Why don't we ride out there and find the pictures" because he had never seen any pictures before. The Defendant denied that he did the acts of which he was accused. On cross-examination, the Defendant said that K.J.'s boyfriend was eleven or twelve at the time of these alleged incidents. The Defendant conceded that the pictures shown earlier in the trial were of K.J. standing in a motel room, unclothed, when she was twelve years old, but he said that he did not take those pictures. The Defendant stated that the pictures were found on his computer and in his mini barn, but reiterated that he did not take the pictures. The Defendant admitted that he had taken pictures of unclothed adult women and put those on his computer, but had never taken any of K.J. or B.C. or any other minor girls. The Defendant denied any sexual contact with B.C. The Defendant admitted that he owned pornographic movies, but denied ever showing them to K.J. The Defendant admitted passing eight worthless checks and admitted that he had four convictions for that offense.

Based upon this evidence, the jury found the Defendant guilty of: attempted aggravated sexual exploitation of a minor (as a lesser-included offense of aggravated sexual exploitation of a minor); incest; attempted rape of a child; seven counts of rape of a child; aggravated sexual battery; sexual exploitation of a minor; aggravated sexual exploitation of a minor; and especially aggravated sexual exploitation of a minor. The trial court sentenced the Defendant as a Range I offender as follows: three years for the attempted aggravated sexual exploitation of a minor conviction, which was Count 1; four years for the incest conviction, which was Count 2; ten years for the attempted rape of a child conviction, which was count 3; twenty-three years for each rape of a child conviction, which were Counts 4 and 6-11; ten years for the aggravated sexual battery conviction, which was Count 5; two years for the sexual exploitation of a minor conviction, which was Count 12; six years for the aggravated sexual exploitation of a minor conviction, which was Count 13; and eleven years for the aggravated sexual exploitation of a minor conviction, which was Count 14. The trial court ordered that Counts 1, 12, 13, and 14 run concurrently with one another, for a total of eleven years, and that Counts 2, 3, 4, and 5 run concurrently with one another, for a total of twenty-three years. Further the trial court ordered at Counts 6, 7 and 8 run concurrently with one another, for a total of twenty-three years, and Counts 9, 10 and 11 run concurrently with one another, for a total of twenty-three years. The court ordered that those four concurrent sentences run consecutively to one another for an aggregate sentence of eighty years.

## B. Case Numbers 15131 and 15236, Appeal Number M2003-01824-CCA-R3-CD

On August 19, 2002, the Bedford County Grand Jury returned a three-count indictment charging the Defendant with one count of aggravated sexual exploitation of a minor, sexual battery by force or coercion,[8] and sexual battery. The following evidence was presented at the Defendant's trial.

---

[8]This count was originally charged as sexual battery by an authority figure, but later amended to sexual battery by force or coercion.

C.G.,[9] who also testified at the Defendant's first trial, testified that she was born on February 4, 1987, and in the summer of 2001 she was fourteen years old. She said that the Defendant's wife is her cousin, and so she had known the Defendant her whole life. She said that the Defendant and his wife lived in her parents' home between 1994 and 1995, and she trusted the Defendant. C.G. testified that, during the summer of 2001, the Defendant's wife called C.G.'s sister and asked if C.G. could baby-sit for her. C.G. said that, at that time, the Defendant and his wife were living in an apartment building. C.G. explained that, sometimes when she baby-sat, she would go over to the Defendant's house and spend the night, so that she would be there when the Defendant's son woke up.

C.G. said that, when she was with the Defendant alone in the apartment, he asked her if she had ever taken any pictures and if she would want to be a model. She said that she did not believe the Defendant at first, but then she began to believe him because he had "all kinds of other girls com[ing] over [and] tak[ing] pictures." She said that the Defendant's daughter told her about the modeling and told her that she was making money from it. She testified that a girl named "Kim" called, said that she was an agent, and said that the Defendant's story that he could make her a model was true. The Defendant told her that, if she modeled, she would get clothes and "thousands of dollars." C.G. testified that, when the Defendant was trying to get her to model, he showed her pictures of other young ladies. She said that, some of the pictures were stored on his computer, and others were hidden behind a brick in the garage. In some of these pictures, the subjects were partially or totally nude. She said that, when the Defendant was convincing her to model, he bounced her breast while he complimented her figure. She said that the Defendant also touched her leg and touched her genital area through her clothing.

C.G. testified that there was a computer in a computer room over the garage. She said that the computer room was "real little." She said that, at first, the Defendant took pictures of her clothed. C.G. said that, thereafter, the Defendant came into the bathroom where she was showering and took a picture of her while she was showering. She said that, later, she agreed to have her picture taken in her bra and panties, and the Defendant took these pictures of her in the computer room at his house. C.G. said that, ultimately, the Defendant took pictures of her nude. She said that one set of these pictures was taken in the computer room, and the other set was taken in his bedroom. She said that, while these pictures were taken, the Defendant's son was sleeping or playing outside, and the Defendant's wife was at work. Eight pictures taken in the computer room were admitted into evidence, in addition to nine pictures taken in the Defendant's bedroom.

C.G. testified that the Defendant would pose her for the photographs. He also placed a blanket on the floor for her to sit on and gave her a t-shirt to wear during one of the sessions. C.G. said that the Defendant told her to try not to let his wife know about the modeling because she would be mad if a bunch of girls were coming over to the house.

C.G. said that, during the last photography session, the Defendant told her to "close her eyes"

---

[9]In order to protect the victim, who is a minor, we refer to her using her initials.

and, when she did, he went down and put his mouth on her genital area. She said that she stopped him quickly, and he told her that he did that just to "relax" her. C.G. testified that she then stopped her modeling sessions. She said that she did not tell her parents or police about them until she was contacted by the police.

On cross-examination, C.G. testified that the pictures were taken around July of 2001 and that the touching occurred around that same date. She said that she did not remember telling the police that this incident occurred around Thanksgiving. C.G. conceded that, at first, she lied to the officer about the events because she did not want her family to think badly of her. She said that, later, she told the officer the truth.

David Williams, Jr., an officer with the Bedford County Sheriff's Department, testified that he searched the Defendant's car on June 8, 2002. He said that the Defendant signed a "permission to search form," after which he searched an "outbuilding." He said that, while he was conducting the search, the Defendant seemed nervous. The officer testified that the police seized a digital camera and a computer from the Defendant's home.

Tom Davis, the computer evidence specialist with the TBI, testified that, when he searched the Defendant's computer, he found numerous photographs of C.G. He said that these pictures were stored on the Defendant's hard drive and, according to the computer files, these were pictures stored on June 28, 2001, through July 3, 2001. On cross-examination, Agent Davis said that a person of average intelligence could operate a computer and download pictures. The Agent said that he could not be sure who put the pictures on the computer.

Rebecca Hord, an officer with the Bedford County Sheriff's Department, testified that she asked Agent Davis to search the Defendant's computer for photographs, and, when he found some, she asked him to print images. She said that she recognized C.G. as one of the girls in the pictures. The officer said that, when she first interviewed C.G., C.G. did not know that the police already had pictures of her from the Defendant's computer.

The Defendant testified that C.G. babysat for his son during the "end of June and all of July and the first week in August." The Defendant said that anyone who wanted to turn on his computer had access to it and that a number of people used the computer. He also testified that a number of people used his camera. The Defendant denied taking any pictures of C.G. On cross-examination, the Defendant testified that C.G. would spend the night at his house to babysit. The Defendant admitted that, in one of the pictures, C.G. appeared to be wearing one of his shirts, but he stated that there were many such shirts in the house. He stated that one of C.G.'s friends could have taken the pictures. The Defendant admitted that he had previously been convicted of passing worthless checks.

Based upon this evidence the jury convicted the Defendant of aggravated sexual exploitation of a minor, sexual battery by force or coercion, and sexual battery. The trial court sentenced the Defendant to ten years for the especially aggravated sexual exploitation of a minor conviction, one

year and six months for the sexual battery conviction, and to one year and six months for the sexual battery conviction. The trial court then ordered that all of the sentences run concurrently with counts 1, 12, 13 and 14 from the first trial.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction in case number 15116 for attempted aggravated sexual exploitation of a minor, aggravated sexual exploitation of a minor, and attempted rape of a child, and he contends that the evidence is insufficient to sustain his conviction in case number 15236 for two counts of sexual battery. The Defendant also contends that the State failed to properly elect facts upon which it would rely for his conviction of sexual exploitation in case number 15116 and for his conviction of especially aggravated sexual exploitation of a minor in case number 15236. Finally, the Defendant asserts that the trial court erred when sentencing him.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Attempted Aggravated Sexual Exploitation of a Minor

The Defendant contends that the evidence presented at trial is insufficient to sustain his conviction for attempted aggravated sexual exploitation of a minor in case number 15116. The

Defendant asserts that the evidence at trial showed that he "may have taken pictures of B.C." He states that, since no pictures of B.C. were found, the State did not prove beyond a reasonable doubt that the Defendant took any pictures. Further, the Defendant asserts that, because there were no pictures, the jury could not determine whether these pictures met the statutory requirements so as to be considered criminal activity.

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (2003). Tennessee Code Annotated section 39-17-1004 (2003) defines aggravated sexual exploitation of a minor, stating:

> (a)(1) It is unlawful for a person to knowingly promote, sell, distribute, transport, purchase or exchange material, or possess with the intent to promote, sell, distribute, transport, purchase or exchange material, which includes a minor engaged in:
> (A) Sexual activity; or
> (B) Simulated sexual activity that is patently offensive.

"Promote" is defined as to "finance, produce, direct, manufacture, issue, publish, exhibit or advertise . . . ." Tenn. Code Ann. § 39-17-1002(5) (2003). "Sexual activity" includes acts that are "Patently offensive, as determined by contemporary community standards." Tenn. Code Ann. § 39-17-1002(7)(C). "Patently offensive" is defined as that "which goes substantially beyond customary limits of candor in describing or representing such matters." Tenn. Code Ann. § 39-17-1002(4).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's conviction. The evidence at trial, viewed in this light, showed that the Defendant woke B.C., who was twelve years old, late one evening, and he asked her if he could take pictures of her. The Defendant directed B.C. to wear a "lingerie outfit," and then he took pictures of her in the outfit. He then asked her to expose her breasts for the pictures, which she did. The Defendant denied that any of these events took place. The jury obviously credited B.C.'s testimony as to whether the Defendant attempted to photograph her, and, therefore, the Defendant was found guilty of attempted aggravated sexual exploitation of a minor. Although the photographs were never found, it is the jury's province to judge the credibility of witnesses, and we do not second-guess the jury on credibility issues. Therefore, we conclude there is sufficient evidence to find the Defendant guilty of attempted aggravated exploitation of a minor.

This holding accords with State v. Ricky Grover Aaron, No. M2002-02288-CCA-R3-CD, 2002 WL 1533825, at *12 (Tenn. Crim. App., at Nashville, July 8, 2004), *rehearing granted* (Aug. 2, 2004).

## 2. Aggravated Sexual Exploitation of a Minor

The Defendant contends that the evidence is insufficient to support his conviction for aggravated sexual exploitation of a minor in case number 15116. He states that the evidence at trial "only showed that he was in possession of the photographs." As stated above, Tennessee Code Annotated section 39-17-1004 (2003) defines aggravated sexual exploitation of a minor, stating:

> (a)(1) It is unlawful for a person to knowingly promote, sell, distribute, transport, purchase or exchange material, or possess with the intent to promote, sell, distribute, transport, purchase or exchange material, which includes a minor engaged in:
> (A) Sexual activity; or
> (B) Simulated sexual activity that is patently offensive.

By its plain language, the statute makes it a crime to knowingly promote material that includes a minor engaged in sexual activity, or simulated sexual activity, that is patently offensive. No transport, purchase or exchange of material is necessary to constitute a crime. "Promote" is defined as to "finance, produce, direct, manufacture, issue, publish, exhibit or advertise . . . ." Tenn. Code Ann. § 39-17-1002(5) (2003). "Sexual activity" includes acts that are "Patently offensive, as determined by contemporary community standards." Tenn. Code Ann. § 39-17-1002(7)(C). As stated above "patently offensive" is defined as that "which goes substantially beyond customary limits of candor in describing or representing such matters." Tenn. Code Ann. § 39-17-1002(4).

After considering the evidence in the light most favorable to the State, we conclude that sufficient evidence exists in the record to support the Defendant's conviction. K.J. testified that, when she was fourteen, the Defendant took her to the shed and took pictures of her while she was naked. These pictures were later discovered in an envelope in the Defendant's shed. The photographs admitted at trial, and included in the record, clearly depict K.J. engaged in both sexual activity and simulated sexual activity. The Defendant denied that he took these pictures and denied that he knew they were hidden in the shed. The jury obviously accredited K.J.'s testimony that the Defendant took these pictures. In our view, the statutory definition of "promote" would clearly include the taking of a photograph, and, thus, the taking of a photograph of an unclothed minor engaged in sexual activity, or simulated sexual activity that is patently offensive, qualifies as "promoting" material of a minor engaged in sexual activity, or simulated sexual activity that is patently offensive. Therefore, the evidence was sufficient to support the Defendant's conviction for aggravated sexual exploitation of a minor.

## 3. Attempted Rape of a Child

The Defendant next contends that the evidence is insufficient to sustain his conviction for attempted rape of a child in case number 15116. The jury found the Defendant guilty of attempted

rape of a child by attempting to perform cunnilingus on B.C. The Defendant contends that the State did not prove that he attempted to perform cunnilingus on B.C. At trial, B.C. testified that "[the Defendant] put his mouth down there . . . . [H]e moved [his mouth] around down there for a little while" and responded affirmatively when asked if the Defendant's mouth was "touching directly" her vagina.

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3). Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "'Sexual Penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997). Cunnilingus, "a sexual activity involving oral contact with the female genitals," does not require that the mouth or tongue actually penetrate into the vagina. See State v. Hoyt, 928 S.W.2d 935, 942 (Tenn. 1995) (quoting State v. Vanderbilt, No. 70, 1992 WL 69650, at *2 (Tenn. Crim. App., at Jackson, April 8, 1992), *perm. app. denied* (Tenn. 1992)), *overruled on other grounds by* Spicer v. State, 12 S.W.3d 48 (Tenn. 2000); see also State v. Crabtree, No. E2001-02374-CCA-R3-CD, 2003 WL 240015, at *4 (Tenn. Crim. App., at Knoxville, Jan. 31, 2003), *perm. app. denied* (Tenn. June 30, 2003). Attempted rape requires proof both that the defendant attempted to sexual penetrate the victim and that the defendant's action constitutes a substantial step toward penetration. State v. Mixon, 983 S.W.2d 661, 676 (Tenn. 1999).

The evidence showed that the Defendant's mouth was in contact with B.C.'s vagina. This is sufficient to prove that he committed rape by sexually penetrating the victim by performing cunnilingus on her. "Sexual penetration" includes cunnilingus and cunnilingus does not require actual penetration, but only mere contact with the genitalia. The fact that the completed crime is proven does not bar a conviction for an attempt. See Tenn. Code Ann. § 39-12-101(c). The evidence is, therefore, sufficient to prove that the Defendant committed attempted rape of a child because, he not only attempted to sexually penetrate the victim, but did, in fact, "sexually penetrate" her as that term is defined by law. This issue is without merit.

## 4. Sexual Battery

Finally, the Defendant contends that the evidence is insufficient to support his two sexual battery by coercion convictions in case number 15236 because the State did not prove the requisite elements of the crime. The State concedes the error, and suggests that we reverse the Defendant's convictions. Sexual battery is defined in Tennessee Code Annotated section 39-13-505 (2003) as:

[U]nlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
(1) Force or coercion is used to accomplish the act;
(2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent;
(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
(4) The sexual contact is accomplished by fraud.

Coercion as defined for purposes of this section "means the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Tenn. Code Ann. § 39-13-505(b). Tennessee Code Annotated section 39-13-501 states that "coercion" also includes "official authority over a child less than fifteen (15) years of age," however, it states that this definition applies to Tennessee Code Annotated sections 39-13-501 through -511, except as specifically provided in section 39-13-505, which is the section defining sexual battery. Therefore, the portion of the definition of coercion that includes "official authority over a child less than fifteen" is not a proper definition of the term "coercion" used in the statute defining sexual battery.

In the case under submission, the jury was only instructed on sexual battery committed by coercion, the trial court having found that there was no evidence that this crime was committed by force. The trial court instructed the jury in accordance with Tennessee Code Annotated section 39-13-501, which includes "official authority over a child less than fifteen (15) years of age." Generally, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. See State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999); State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. Elder, 982 S.W.2d at 876. Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001); State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. State v. Williams, 977 S.W.2d 101, 104 (Tenn. 1998). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Hodges, 944 S.W.2d 346,

352 (Tenn. 1997); see also State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997).

We agree with the parties that the trial court erred when it instructed the jury on sexual battery by coercion because it improperly defined coercion. Further, we conclude that this error was not harmless beyond a reasonable doubt. Accordingly, we reverse these two convictions for sexual battery and remand the case back to the trial court for further proceedings consistent with this opinion on these counts. We note that our reversal does not affect the Defendant's sentence because the trial court ordered that his sentence for these offenses run concurrently with his sentences in case number 15116.

## B. Election

The Defendant contends that the State failed to elect facts upon which it was relying to establish sexual exploitation of a minor (count 12) in case number 15116, and for especially aggravated sexual exploitation of a minor (count 1) in case number 15236. The State asserts that the Defendant has waived this issue because he did not raise an objection to it at either of his trials, and he did not raise the issue in either of his motions for a new trial. After thoroughly reviewing the record, we conclude that this issue has been waived because the Defendant failed to include this issue in his motion for new trial. Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); see State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). Accordingly, the Defendant's failure to raise the issue in his motion for a new trial precludes our review of this issue, subject to our noticing "plain error." See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a).

Issues that rise to the level of plain error lie within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. See Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). In Adkisson, this Court stated that the following factors should be considered by an appellate court when determining whether an error constitutes "plain error:"

> (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is "necessary to do substantial justice.

Adkisson, 899 S.W.2d at 641-42 (citations omitted). Failure of the State to elect offenses when the proof requires an election is plain error. See State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997). The question then becomes whether the proof requires an election so as to meet the requirements for our plain error review. For the following reasons we conclude that the proof does not so require. However, even if we reviewed this issue for plain error, we could not provide the Defendant the relief that he seeks.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993)). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citing Brown, 992 S.W.2d at 391); see Kendrick, 38 S.W.3d at 568. The Tennessee Supreme Court explained that "'[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence.'" Kendrick, 38 S.W.3d at 568 (quoting Shelton, 851 S.W.2d at 137). Moreover, the election requirement serves other interests as well: "it enables a defendant to prepare for a specific charge; it protects a defendant against double jeopardy; it enables the trial court to review the weight of the evidence in its capacity as thirteenth juror; and it enables the appellate court to review the legal sufficiency of the evidence." Id.

"The necessity of requiring the State to make an election of the particular offense it will rely on for conviction . . . is . . . fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, "there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court held that "where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible," but, at the close of proof, the State must elect the facts upon which it is relying for conviction. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994).

In the case number 15116, the verdict form reads, "We, the Jury, find the Defendant, Guilty of Sexual Exploitation of a Minor alleged to have occurred in June, 2002." Sexual exploitation of a minor is codified in Tennessee Code Annotated section 39-17-1003, which states, "It is unlawful for a person to knowingly possess material that includes a minor engaged in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." When discussing this election issue before the trial court, the State asserted that all of the pictures found on the Defendant's computer and in

the shed constituted "material," an argument that the Defendant did not oppose at trial. Now, on appeal, the Defendant asserts that each of these pictures constitutes a separate offense, which would require the State to elect a single photograph upon which it sought the conviction. The State counters that all of the pictures were part of a single transaction so it was not required to elect.

We first note that, while the State introduced pictures found in the Defendant's shed and pictures found on the Defendant's hard drive, the pictures found in the shed were merely print copies of the pictures found on the Defendant's computer. These pictures showed the Defendant's penis penetrating the minor victim, a minor victim masturbating, and unclothed minor victims in revealing poses. The State sought only one conviction for all of these pictures. This Court provided an analysis for determining whether a particular conduct constituted one or more violations in State v. Davis, 654 S.W.2d 688 (Tenn. Crim. App. 1983). The legislature has the power to create multiple "units of prosecution" within a single statutory offense, but it must do so clearly and without ambiguity. State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997). Should the Legislature fail in this duty, the ambiguity will be resolved in favor of lenity. Id. (citations omitted).

In Davis, the defendants were charged and convicted of several counts of selling obscene materials. Id. at 690. The Court addressed the issue of whether a single sale by one person to an undercover officer of six separate items can be the basis of multiple offenses and multiple sentences. Id. at 695. The Court held that, generally, if the statute prohibits individual acts, then each act is punishable separately. Id. at 696. If, however, it prohibits the course of action which the several acts constitute, then there can be only one penalty. Id. The Court then held that, because the Legislature did not clearly fix a punishment for the sale of each obscene item within a single transaction, the doubt was resolved in favor of a single offense.

In the case under submission, the controlling statute is similar to the one in Davis, and provides that it is a crime to "knowingly possess material" that includes a minor engaged in sexual activity. The statute defines "material" as "[a]ny picture, drawing, [or] photograph . . . or [a]ny image stored on a computer hard drive," Tennessee Code Annotated section 39-17-1002(2)(A), (C) (2003), but it does not clearly fix a punishment for the possession of each obscene item within a single transaction. Therefore, the doubt results in favor of the Defendant in that he may only be prosecuted for one crime. This, however, relieves the State of its burden to elect a particular photograph upon which it will rely for the conviction because the possession of all the photographs constitutes one crime, not separate crimes for each photograph. The Defendant's issue is, accordingly, without merit.

The same analysis provides guidance to our holding on the Defendant's next contention, which is that the State failed to elect facts as the basis for his especially aggravated sexual exploitation of a minor conviction in case number 15236, for taking pictures of C.G. The victim testified that she was a minor and that the Defendant took pictures of her unclothed in the computer room and in his bedroom. At the Defendant's trial in case number 15236 the State introduced seventeen pictures of C.G., which she testified that the Defendant had taken. The Defendant denied taking these pictures. The State sought only one conviction for the Defendant's action of taking the

pictures. The jury convicted the Defendant for especially aggravated sexual exploitation of a minor because he promoted material, by producing material, that depicted a minor participating in sexual activity. On appeal, the Defendant complains that the State failed to elect facts. We find that this issue is without merit. These pictures were part of the same transaction or occurrence. The photographs were of a single victim and were taken at a single residence. Therefore, in accordance with the aforementioned reasoning and authorities, the State was not required to elect facts.

### C. Sentencing

The Defendant does not clearly state whether he disputes his sentence from case number 15116 or case number 15236. In light of the Defendant's argument in his brief, because the only citation that he provides in his brief is to case number 15116, and because all of the sentences in case number 15236 were ordered to run concurrently with the sentences in case number 15116, we conclude that the Defendant intended to appeal only the sentences imposed upon him in case number 15116. The Defendant contends that the sentence imposed upon him was excessive. He "concedes that the aggravating factors applied were appropriate, [but] he contends that the court gave them too much weight." Additionally, the Defendant asserts that the trial court failed to consider one mitigating factor, i.e. that his conduct neither caused nor threatened serious bodily injury. Further, the Defendant asserts, that the trial court improperly considered the range for the Class A felonies as twenty to twenty-five years. Finally, the Defendant asserts that the trial court improperly ordered consecutive sentencing.

When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a <u>de novo</u> review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" <u>State v. Ross</u>, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting <u>State v. Pettus</u>, 986 S.W.2d 540, 543 (Tenn. 1999)); <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. <u>State v. Dean</u>, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); <u>State v. Butler</u>, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); <u>State v. Smith</u>, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a <u>de novo</u> review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); <u>State v. Taylor</u>, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court

considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision <u>de novo</u> with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. <u>See</u> Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We note that the defendant bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; <u>Ashby</u>, 823 S.W.2d at 169.

## A. Mitigating Factor

We first address the Defendant's contention that the trial court erred when it failed to apply one allegedly appropriate mitigating factor, that the Defendant's conduct neither caused nor threatened serious bodily injury. The Defendant's counsel stated before the trial court "I have looked at this thing and looked at this thing. I can find no mitigating factors to submit to the Court based upon the proof that we have had." When sentencing the Defendant, the trial court stated "The Court does not find there to be any mitigating factors that could be applied to any of the . . . counts in the indictment." In the Defendant's motion for new trial he stated that his "sentence [wa]s excessive and contrary to law," and, at the hearing on the motion for new trial, he contended that his sentence was excessive, but provided no specific grounds to support that contention. The Defendant did not, at sentencing, in his motion for new trial, or at the hearing on his motion for new trial, ever assert that the trial court should have applied any mitigating factors, including mitigating factor (1), that his actions neither caused nor threatened serious bodily injury.

Nevertheless, we conclude that the trial court did not err by refusing to consider this mitigating factor when it sentenced the Defendant. We again note that the trial court's determinations as to the sentences are entitled to a presumption of correctness because the record reflects that in sentencing the Defendant, the trial court considered the relevant facts, circumstances, and sentencing principles. Regarding the Defendant's claim that the trial court should have considered mitigating factor (1), as long as the trial court followed the sentencing purposes and principles, the weight, if any, to be give to the trial court's discretion. It is clear that the trial court did not err when it refused to consider mitigating factor (1) when sentencing the Defendant for his rape, aggravated sexual battery, and incest convictions, which were all a result of his crimes against the two minor victims. The Defendant was convicted of raping, or attempting to rape, both of the victims in case number 15116, and all of these crimes were the result of his sexual contact with both of these minor victims.[10] We are compelled to note that every rape is physically and mentally injurious to the victim. <u>See</u> <u>State v. Kissinger</u>, 922 S.W.2d 482, 487 (Tenn. 1996); <u>State v. Edward Earl Huddleston</u>, No. 02C01-9706-CC-00228, 1998 WL 67684, at *3 (Tenn. Crim. App., at Jackson, Feb. 20, 1998), *perm. app. denied* (Tenn. Oct. 19, 1998). In <u>Huddleston</u>, we stated, "It is difficult to conceive of any factual situation where the rape of a child would not threaten serious bodily

---

[10]As previously noted, it appears from the Defendant's brief that he is only appealing his sentence in case number 15116.

injury." Huddleston, 1998 WL 67684, at *3. Additionally, "serious bodily injury" as defined by the statute includes an injury that involves "extreme physical pain." Tenn. Code Ann. § 39-11-106(a)(34) (2003). In the case under submission, the minor victim testified that the Defendant's penetration of her "hurt," and she told him that it hurt, but he refused to stop. We have held that injuries similar to the victim's in this case constitute serious bodily injury for the purposes of the statute. See Huddleston, 1998 WL 67684, at *3 (citing State v. Dison, No. 03C01-9602-CC-00051, 1997 WL 36844 (Tenn. Crim. App., at Knoxville, Dec. 1, 1997), *perm. to appeal denied* (Tenn. Jan. 31, 1997)). Further, serious bodily injury also includes a mental element. Id. Clearly, the fact that both the victims in case number 15116 were raped at age twelve necessarily includes mental anguish and suffering.

Similarly, the evidence does not preponderate against the trial court's refusal to consider mitigating factor (1) when it sentenced the Defendant for the attempted aggravated sexual exploitation, sexual exploitation, aggravated sexual exploitation, and especially aggravated sexual exploitation of these two minors. The Defendant took these pictures before and after he raped or attempted to rape these two young girls. The Defendant committed these crimes of sexual exploitation by creating photographs of these two girls engaged in sexual behavior. Additionally, one such photograph was of him raping the victim, and it depicted his penis penetrating the victim. While we note that, in some instances, mitigating factor (1) can be, and is, properly considered when sentencing a defendant for crimes involving the sexual exploitation of a minor, the record does not preponderate against the trial court's decision that the mitigating factor is inapplicable in this case. This issue is without merit.

## B. Excessive Sentence

The Defendant asserts that his sentence is excessive. While he concedes that the trial court properly applied the enhancement factors, he contends that it gave them too much weight. He also asserts that the trial court erred when it considered the range applicable to his Class A felonies. The State counters that the weight given to enhancement factors is within the discretion of the trial court, and the trial court did not err when it sentenced the Defendant. Prior to sentencing, the trial court found that the Defendant was a Range I, standard offender. It stated that no mitigating factors applied but that the following four enhancement factors applied pursuant to Tennessee Code Annotated section 40-35-114: (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (8) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; (9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and (16) The defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. When finding that enhancement factor number 2 applied, the trial court stated:

> The Court finds that the [D]efendant has a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. . . . Now,

aside from the worthless check cases which the court can consider as criminal convictions, the Court would not place as significant amount of emphasis on those offenses, but for the fact that the [D]efendant had several uncharged episodes of criminal behavior that were not a part of this indictment, but yet which the proof at trial for various reasons came forward involving not only these victims, but another victim in another jurisdiction. The Court finds that is criminal behavior that the Court can take into consideration.

The Court also believes that where there are multiple counts in an indictment over a significant period of time, that the later in time – or the earlier in time counts of the indictment may be used to enhance the later in time counts of the indictment as criminal behavior. The Court places significant importance upon this enhancing factor as it involves the same type and nature of criminal conduct for which the [D]efendant stands convicted in this court.

. . . .

The Court does find, not because of the misdemeanor convictions which the [D]efendant has, but the Court does find the [D]efendant's criminal history is extensive. . . .The Court can consider not only the [D]efendant's past record before the [D]efendant committed these offenses, which is relatively in the scheme of things insignificant, but also the number, nature and degree of offenses which the [D]efendant stands convicted before the Court.

The trial court then sentenced the Defendant as follows:

Count 1 Attempted Aggravated Sexual Exploitation of a Minor, a Class D felony, three years.
Count 2 Incest, a Class C felony, four years.
Count 3 Attempted Rape of a Child, a Class B felony, ten years.
Count 4 Rape of a Child, a Class A felony, twenty-three years.
Count 5 Aggravated Sexual Battery, a Class B felony, ten years.
Count 6 through 11, Rape of a Child, a Class A felony, twenty-three years for each count.
Count 12 Sexual Exploitation of a Minor, a Class E felony, two years.
Count 13 Aggravated Sexual Exploitation of a Minor, a Class C felony, six years.
Count 14 Especially Aggravated Sexual Exploitation of a Minor, a Class B felony, eleven years.

In the judgment of conviction forms, the trial court ordered, in accordance with statute, that the child rape cases be served at 100%.

The sentence range for Class A felony, Range I offenders is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). In calculating the sentence for a Class A felony, the

presumptive sentence is the midpoint of the range, in the absence of enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the sentence must be set at or above the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court must set a sentence at or below the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). If there are both mitigating and enhancement factors, the trial court must adjust the sentence based on the weight it assigns to each factor. Tenn. Code Ann. § 40-35-210(d).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the statutory minimum for a Range I offender if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Tenn. Code Ann. § 40-35-210(e). The sentence ranges for a Range I offender are as follows:

> (2) For a class B felony, not less than eight (8) nor more than twelve (12) years;
> (3) For a class C felony, not less than three (3) nor more than six (6) years;
> (4) For a class D felony, not less than two (2) nor more than four (4) years; and
> (5) For a class E felony, not less than one (1) nor more than two (2) years.

Tenn. Code Ann. § 40-35-112 (2003).

The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S. Ct. at 2537. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a *right* to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2539.

Becuase the trial court specifically stated that it gave little, if any, weight to the Defendant's previous misdemeanor convictions, none of the enhancement factors used by the trial court to enhance the Defendant's sentence were submitted to a jury or admitted by the Defendant. Therefore, the rule in Blakely precludes application of any of these factors. Because there are no enhancement factors that were proven to a jury beyond a reasonable doubt or admitted by the Defendant, the sentence must be modified to the presumptive minimum. See State v. Walters, M2003-03019-CCA-R3-CD, 2004 WL 2246196 (Tenn. Crim. App., at Nashville, Oct. 4, 2004). Therefore, the

Defendant's sentences are modified as follows:

> Count 1 Attempted Aggravated Sexual Exploitation of a Minor, a Class D felony is modified from three to two years.
> Count 2 Incest, a Class C felony, is modified from four to two years.
> Count 3 Attempted Rape of a Child, a Class B felony, is modified from ten years to eight years.
> Count 4 Rape of a Child, a Class A felony, is modified from twenty-three years to twenty years.
> Count 5, Aggravated Sexual Battery, a Class B felony, is modified from ten years to eight years.
> Counts 6 through 11, Rape of a Child, a Class A felony, are modified from twenty-three years for each count to twenty years for each count.
> Count 12 Sexual Exploitation of a Minor, a Class E felony, is modified from two years to one year.
> Count 13 Aggravated Sexual Exploitation of a Minor, a Class C felony, is modified from six years to three years.
> Count 14 Especially Aggravated Sexual Exploitation of a Minor, a Class B felony, is modified from eleven years to eight years.

We further hold that the Defendant must serve an effective sentence of sixty-eight years, sixty of which will be served at 100% in accordance with the Tennessee Code Annotated section 40-35-501(i)(1), (2)(I) (2003).

We note that the Defendant's contention that the trial court improperly considered the range for a class A felony is without merit. The trial court noted that the presumptive minimum sentence for a class A felony was twenty years, then it found that because there were applicable enhancement factors, but no mitigating factors, the applicable range was twenty to twenty-five years. This is not an incorrect statement of the law. Additionally, because we have reduced the Defendant's sentence to the presumptive minimum, we conclude that there is no need to address this issue further.

### B. Consecutive Sentences

The Defendant argues that the trial court erred by ordering his sentences to run consecutively. The Defendant asserts that ordering the sentences to run concurrently would have been sufficient to achieve the purposes of the trial court.

> The Court does find that the – all of these offenses involve minors; that the relationship between the [D]efendant and the minors were extensive; that the sexual exploitation of these minors was to a degree and to a nature, given not only that it involved persons close to the [D]efendant where he should have had a close relationship, but also the length of time involved in each of these cases. . . . In addition to that, therefore, the [D]efendant is eligible for consecutive sentencing

-24-

under that provision of the consecutive sentencing statute.

. . . .

But certainly, this record is replete with the [D]efendant's criminal activity involving these minors, which is extensive. And for that reason, the [D]efendant is eligible for consecutive sentencing.

The trial court then ordered:

[T]he Court shall run counts 1, 12, 13 and 14 concurrently one with the other. The Court shall run 2, 3, 4 and 5 concurrently one with the other. The Court shall run counts 6, 7 and 8 concurrently one with the other. And counts number 9, 10 and 11 concurrently one with the other. [Those sentences will each run consecutively to each other]. That gives the [D]efendant a total sentence, by my count, of 80 years. The Court feels that that is an appropriate sentence given the grossly shocking, in this Court's mind, type of case that the [D]efendant has. The Court believes that the [D]efendant is a sexual predator, which requires that he be kept separate from our society for as long as we possibly can.

Pursuant to Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one criminal offense, the court shall order the sentences to run either consecutively or concurrently. The trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b)(1)-(7). Tennessee Code Annotated section 40-35-115(b)(5) provides that a trial court may find that consecutive sentencing is proper where:

The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

The trial court did not abuse its discretion by ordering that some of the Defendant's convictions run consecutively. This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm all of the Defendant's convictions in both trials, except for two of his convictions for sexual battery in case number 15236 because the jury was improperly instructed on those counts, and the instructional error was not harmless beyond a reasonable doubt. Our reversal does not affect the Defendant's sentence because

the trial court ordered that the Defendant's sentences for these crimes run concurrently with his sentences in case number 15116. Further, in case number 15116, we reduce the Defendant's sentence in to an effective sentence of sixty-eight years, sixty of which must be served at 100%. We remand the case for the entry of appropriate judgments of conviction.

_____
ROBERT W. WEDEMEYER, JUDGE